UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

UNITED STATES OF AMERICA,

          Plaintiff,

v.

D-1 MARCELLUS WALLACE,

          Defendant.

_____/

Case No.: 21-cr-20036

HON. LAURIE J. MICHELSON

## United States' Sentencing Memorandum

According to the Michigan Department of Corrections (MDOC) website, after being sentenced to serve five-and-a-half to fifteen years of imprisonment, defendant Marcellus Wallace was paroled on October 27, 2020. In less than two months after being released, and with the opportunity to change his life with a successful and lucrative Rap career, defendant committed the instant offense and then tried to bribe someone to "take the rap."

For the reasons stated in this memorandum, and because of the recidivist behavior of defendant Wallace, the government recommends a sentence at the bottom of the determined guidelines range, as "sufficient, but not greater than necessary, to comply with the purposes of 18 U.S.C. § 3553(a)." *United States v. Vowell*, 516 F.3d 503, 512 (6th Cir. 2008) (internal quotation marks and citations omitted).

1

## I.      Facts and Procedural History

## A. The instant offense on December 8, 2020

On December 8, 2020, at about 6:52 p.m., as captured on the police squad

car dash cam video, a white Maserati car was driving at night with its lights off.



Maserati with no lights on.

Royal Oak Police activated their overhead lights and pulled the car over for

the traffic infraction. The driver/chauffer was Mr. A.M (a/k/a "Crave").  Co-

Defendant Nolan Dasgupta-Francis (a/k/a "NOLO") was seated in the rear behind

the driver and Defendant Marcellus Wallace was seated next to him and behind

the front passenger's seat.



Defendant Wallace

Co-defendant Dasgupta-Francis (a/k/a "NOLO"

During the stop, police noticed red plastic cups in the cupholder near the driver. Suspecting the driver, Mr. A.M. (a/k/a "Crave"), was drinking and driving and there were open intoxicants in the car, the police asked him.



2020-12-08  18:55:30  -0500
AXON BODY 3  X6039B552

Driver, Mr. A.M. a/k/a "Crave"

Red cups

Mr. A.M. stated he was not drinking. Co-defendant Dasgupta-Francis and defendant Wallace spoke up and informed officers that they were drinking alcohol and not the driver.  Police asked numerous times whether anything illegal such as weapons or drugs was in the car. Defendant Wallace and co-defendant Dasgupta-

Francis repeatedly denied it at first. Finally, co-defendant Dasgupta-Francis

reached into the upper storage compartment—above the rear seat armrest—and

pulled out a partially consumed bottle of "Johnny Walker Black" liquor he

showed to the officers.






Officers again asked if there were any weapons or drugs in the car, both

4

defendant and co-defendant denied it. Based upon the open intoxicants, police got all parties out of the vehicle so they could search it. As soon as an officer shined his light into the area vacated by defendant Wallace, he stated there were two guns.

Defendant Wallace exiting the car



Officer spots guns on the floor near where Defendant Wallace sat

Defendant Wallace



After the officer noticed the guns, defendant Wallace and co-defendant were both handcuffed and placed into the back seat of patrol cars.[1]  Defendant Wallace

---

[1] Upon first exiting the car, the officer asked Defendant Wallace if he wanted to sit in the squad car given his apparent foot injury. Defendant refused the accommodation.

was placed into the same squad car as the driver, Mr. A.M. (a/k/a "Crave").  Co-defendant was placed into a separate squad car by himself. During a search of the Maserati, at the feet of where Wallace sat, officers found: a small baggie containing marijuana, a .40 caliber FNH, Model FNS40C handgun (with a chambered live round) and an inserted magazine containing 14 live rounds;[2] and a .45 caliber, Springfield Armory, Model XD45 handgun (with a chambered live round) and an inserted magazine containing 7 live rounds.





Marijuana

.45 caliber, Springfield Armory, Model XD45 handgun & magazine

FNH. Model FNS40C, .40 caliber handgun & magazine

---

[2] Co-defendant Dasgupta-Francis's palm print was recovered off one side of the FNH magazine.

At the feet area of where co-defendant Dasgupta-Francis sat, officers also recovered: a Diamondback Firearms, Model DB15, .223 Remington caliber semi-automatic handgun with a double drum magazine (with one chambered live round) containing 11 live rounds; and a Glock, Model 30, .45 ACP caliber handgun (with one live round in the chamber) and an inserted magazine containing 10 live rounds of .45 caliber ammunition. The Glock handgun was at the feet of where co-defendant Dasgupta-Francis sat but slightly pushed underneath the driver's seat.



Glock, Model 30 & magazine



Diamondback firearm & double drum magazine

While the officers searched the Maserati, Mr. A.M. and defendant Wallace were left alone in the squad car. Defendant Wallace began to scheme how to avoid legal repercussions from his unlawful firearms possession.

**B. The $20,000 Offer to Mr. A.M. ("Crave") to Take the Rap.**

While in the back seat of the squad car, defendant Wallace asked the driver, Mr. A.M. (a/k/a "Crave"), if he would take the case for them. When Mr. A.M. exhibited reluctance, defendant Wallace asked Mr. A.M. to use his personal phone and call "Tee."[3] When "Tee" came on the phone, defendant Wallace explained they had been stopped by police who "found everything in that b*tch." Wallace also admitted to "Tee" that "[W]e had everything in that b*tch bro'." "Tee" advised defendant Wallace that someone would "have to say it was theirs before the police would let the other two go." "Tee" promised that if that happened, "he would take care of the rest." **(See Government's Exhibit 1, squad car video segment, submitted to chambers; and Exhibit 1A, transcript of squad car video segment, filed on ECF, with both incorporated by reference)**.

Defendant Wallace told Mr. A.M. that he and co-defendant "NOLO" would "get five years because they were on parole." Since they were both on parole, defendant Wallace offered $20,000 to Mr. A.M. to say the guns were his. When Mr. A.M. questioned what would happen if he did it, defendant Wallace told Mr. A.M. that "[He] would catch a case and was likely to get a couple of months because it's [his] first offense." Defendant Wallace stated, "He and 'Tee' were going to make sure [he] was straight" if he did take the rap. Later, defendant

---

[3] Defendant Marcellus Wallace's brother, Terry Sanchez Wallace Jr., is the noted rapper "Tee Grizzley."

Wallace told Mr. A.M. that "[They] would be obligated to him."

Defendant Wallace's $20,000 offer was not an empty one. A day or two before this offense, defendant Wallace (a/k/a "Baby Grizzley") signed a lucrative record deal, as a rap artist, for $300,000 cash. In fact, prior to being asked to exit the Maserati, Wallace told one of the officers about his recent success and how it was all on Instagram. He even repeated this story during the booking process. His Instagram social media posts with the username "Babyygrizzleytd" showed him with some of the proceeds.



When he was booked, Wallace had $3,927 on his person consisting of: 39-$100 bills; 1-$20 bill; 1-$5 bill; and 2-$1 bill. During booking, officers investigated the Instagram posts Wallace continued to proudly boast about. They saw the above posts of him with the large stack of cash and another of him with a

glass of wine in a setting that looked like a hotel room.



$3,927 cash found on Defendant Wallace



During booking, officers discovered all three occupants of the Maserati possessed room key cards for the Townsend Hotel in Birmingham, Michigan. Believing more guns were back at the hotel, officers obtained and executed a search warrant. Officers found more of Wallace's record deal money. Inside a "No Limits" bag seated on a chair; officers found $79,600 in cash consisting of 796-$100 bills. Inside the bedside tabletop drawer, officers found a Chase bank money bag containing $20,000 consisting of: 200-$50 bills and 100-$100 bills. In total, officers found $99,600 in cash.




$79,600 cash






$20,000 cash

$99,600 cash

## C. Wallace's Criminal History

Although he is now twenty-five years old, courts have tried and failed to rehabilitate defendant Marcellus Wallace since he was fourteen years old. Wallace

has been steadily engaged in criminality since the age of fourteen. Wallace is the epitome of recidivism! Wallace's criminal history reveals that at the ages of 14–16, he had an annual run of convictions for numerous offenses in juvenile court. (PSR at ¶¶ 40–42). At the age of fourteen, Wallace was convicted of larceny less than $200; at fifteen, carrying a concealed weapon; and at sixteen, receiving and concealing a stolen motor vehicle. (*Id.*). At one point during his annual juvenile crime spree, Wallace was removed from his home for approximately seven months due to truancy from home and new criminal conduct. (*Id.*).

At seventeen years of age, Wallace continued his annual crime spree and graduated to adult court where he was convicted of another car theft felony offense. (PSR at ¶ 43). Wallace pleaded guilty to the offense on March 17, 2015. However, a month later, and still at the age of seventeen, and apparently while on probation for his recent car theft offense, Wallace committed and was convicted of an unarmed robbery. (*Id.* at ¶¶ 43–44). Wallace was sentenced to eleven months custody for violating probation for the recent car theft offense. (*Id.*). On June 30th, 2015, Wallace was sentenced to six-and-a-half to fifteen years in the Michigan Department of Corrections (MDOC) for the robbery offense. The MDOC website: https://mdocweb.state.mi.us/OTIS2/otis2profile.aspx?mdocNumber=957519 notes that Wallace was released from prison and paroled on October 27th, 2020.

Not even a full two months after getting released from prison, on December

8th, 2020, defendant Wallace committed the instant offense. That period of incarceration in the MDOC was the only thing that interrupted his annual crime spree—a crime spree which continually ran from the time he was fourteen years until he was incarcerated! Within two months of being paroled, and at a time when he should have been on the right track with his Rap career, Wallace resumed his criminal spree by committing the instant offense. As the instant crime and his criminal history reveals, Wallace refuses to conform his conduct to stop committing criminal offenses. Pursuant to the terms of the Rule 11, Wallace should be sentenced at the bottom of the determined guidelines range to interrupt his annual crime spree mindset and give the community a much-needed respite from his criminal ways.

## II.     Sentencing Guidelines Calculation and Relevant 3553(a) Factors

As an initial matter, the government understands how Probation calculated a guideline range of 70 to 87 months.  (PSR ¶ 78).  The Supreme Court has noted that, in formulating the Sentencing Guidelines, the U.S. Sentencing Commission's goal is to carry out the objectives of 18 U.S.C. § 3553(a). *United States v. Rita*, 551 U.S. 338, 350 (2007). While advisory, the guidelines remain an important factor in fashioning a just sentence. This is because "it is fair to assume that the Guidelines, insofar as practicable, reflect a rough approximation of sentences that might achieve section 3553(a)'s objectives." *Id.*

Congress has provided, through 18 U.S.C. § 3553(a), the relevant objectives and factors to be considered to impose a sentence "sufficient, but not greater than necessary." Those objectives include: (1) the nature and circumstances of the offense, and the history and characteristics of the defendant; (2) the need for a sentence to reflect the basic aims of sentencing (including retribution, deterrence, incapacitation, and rehabilitation); (3) the kinds of sentences legally available; (4) the Sentencing Guidelines; (5) Sentencing Commission policy statements; and (6) the need to avoid unwarranted sentencing disparities (nationwide) among defendants with similar records found guilty of similar conduct. But sentencing starts with the calculation of the Guidelines range to promote the sentencing goals of Congress, namely to "provide certainty and fairness in meeting the purposes of sentencing, while avoiding unwarranted sentencing disparities[.]" *United States v. Booker*, 543 U.S. 220, 264 (2005).

Moreover, the guidelines "should be the starting point and the initial benchmark" for choosing a defendant's sentence. *Gall v. United States*, 552 U.S. 38, 49 (2007).

**A. Advisory Guidelines Range**

There is a valid basis for the position taken by Probation about several sentencing enhancements, and their guidelines calculation of 70 to 87 months, and the Government offers the following response to aid the Court in addressing

Wallace's overarching objections, and the parties' anticipated total offense level.

> i.        Possession of The Firearm with a High-Capacity Magazine

First, Wallace argues that this offense does not warrant a base offense level of 22 for possession of a firearm capable of accepting a high-capacity magazine. U.S.S.G.§ 2K2.1(a)(1)(B). "The burden is on the government to prove, by a preponderance of the evidence, that a particular sentencing enhancement applies." *United States v. Dupree,* 323 F.3d 480, 491 (6th Cir.2003).

Wallace in the phone call with "Tee" said, "[W]e had everything in that b*tch [Maserati vehicle]."  Wallace's reference to "[W]e had everything…," indicates joint possession of the four firearms found inside the Maserati. (**Government's Exhibit 1 and 1A incorporated by reference**). Possession can be actual or constructive, including joint possession over the same premises or contraband. *United States v. Hall*, 20 F.4th 1085, 1106 (6th Cir. 2022). By a preponderance of the evidence, and based upon his own statement indicating joint possession, defendant Wallace had actual possession of two of the firearms, the .40 caliber FNH, Model FNS40C handgun and the .45 caliber, Springfield Armory, Model XD45 handgun. By a preponderance of the evidence, Defendant Wallace also had constructive and joint possession of the other two firearms, the Glock, Model 30, .45 ACP caliber handgun, and the Diamondback Firearms, Model DB15, .223 Remington caliber semi-automatic handgun which had a high-

capacity dual drum magazine.

While Probation is technically correct that the enhancement applies, and a preponderance of the evidence backs its application, in fairness, the parties' Rule 11 plea agreement (ECF 35; PageID.104) contemplated a base offense level of 20 for having a prior violent felony conviction pursuant to U.S.S.G.§ 2K2.1(a)(4)(A), a two-level enhancement for obstruction of justice pursuant to U.S.S.G.§ 3C1.1, and a four-level enhancement for an altered serial number pursuant to U.S.S.G.§ 2K2.1(b)(4)(B).  The parties anticipated a total offense level of 26 before acceptance of responsibility. Probation calculated a total offense level of 28. It was the parties' intention to track each defendant's respective felon-in-possession counts as charged in the first superseding indictment (ECF 28; PageID.81) which held each defendant responsible for only the two guns nearest him. However, in paragraph 8A, the Rule 11 plainly states that "The Court will determine the defendant's guidelines at sentencing." (ECF 35; PageID.103). Moreover, per the wording of the Rule 11, the guideline provisions the parties' cited are "recommendations." (*Id*. at PageID.104–105).

As a further indication that the Court is the final arbiter on the guidelines determination and calculation, despite the parties' recommendations, paragraph 8E prohibits any party from withdrawing from the Rule 11 if the Court determines a different guideline range, including one that does not follow the parties'

17

recommendations. (*Id.*).

      ii.     <u>Possession of Three or More Firearms</u>

Next, Wallace argues that this offense does not warrant a two-level enhancement for possession of three or more firearms. U.S.S.G.§ 2K2.1(b)(4)(A). For the same reasons of actual, joint, and constructive possession as argued above, and by a preponderance of the evidence, the Probation Department correctly applied the two-level enhancement for possession of three or more firearms.

      iii.     <u>Altered Serial Number</u>

The Rule 11 contemplated a four-level enhancement for the .40 caliber FNH, Model FNS40C handgun having an altered or obliterated serial number. (ECF 35; PageID.104–105). U.S.S.G.§ 2K2.1(b)(4)(B). In describing, the alteration/damage to the serial number, the Royal Oak Police Report stated, "The FNH FNS 40C has a severely scratched/damaged serial number and the serial number is *believed to be* CSU0002744." (Emphasis added). Obviously, they were uncertain.

In speaking with the ATF Special Agent, who is also an interstate nexus expert and the case agent, he said he was able to determine some portions of the serial number visually but had to determine the other portions, and figure out the true serial number, only through a process of elimination guessing method. In *United States v. Sands*, 948 F.3d. 709, 713–15 (6th Cir. 2020), the Sixth Circuit said, a serial number is "'altered or obliterated' when it is materially changed in a

way that makes accurate information less accessible." The Government believes

the serial number on the FNH FNS 40C firearm has been altered consistent with

the *Sands* opinion and *United States v. Harris*, 720 F.3d. 499, 501 (4th Cir. 2013),

which was cited with approval by the Sixth Circuit in *Sands*. The *Harris* Court

stated that if the serial number has been made less legible, then it has been altered.

In the case at bar, the Royal Oak Police were uncertain about the serial number and

the ATF Special Agent had to perform a process of elimination guess work to

determine the full serial number. Thus, the damage made accurate information less

accessible. *Sands*, 948 F.3d. at 715. Therefore, the serial number was rendered less

legible or altered. *Harris*, 720 F.3d. at 501.

(Photos of the gun's damaged serial number are below).



19

iv.     Stolen Firearms

Although the parties missed including it as a recommendation in the Rule 11, Probation correctly assessed a two-level enhancement because three of the guns were in fact stolen, to wit: the .40 caliber FNH, Model FNS40C handgun, the .45 caliber, Springfield Armory, Model XD45 handgun, and the Diamondback Firearms, Model DB15, .223 Remington caliber semi-automatic handgun. U.S.S.G.§ 2K2.1(b)(4)(A). This is supported by a preponderance of the evidence.

v.     Obstruction of Justice

The Rule 11 contemplated a two-level obstruction enhancement for defendant Wallace's offer of $20,000 to Mr. A.M. to take the rap for the guns. U.S.S.G § 3C1.1. The squad car video tape supports application of this enhancement by a preponderance of the evidence. **(See Government's Exhibits 1 and 1A incorporated by reference)**. *United States v. Huntley*, 530 Fed. Appx. 454 (6th Cir. 2013) (finding application of the § 3C1.1 obstruction of justice enhancement was warranted where defendant asked an intermediary to reach out and ask someone else to take responsibility for the firearm in the felon in possession offense); *United States v. Watkins*, 2022 WL 43291 (6th Cir. 2022) (finding the same). Here, because he and co-defendant were both on parole, defendant Wallace first asked Mr. A.M. to take the blame and said, "[T]hey gone pay you." Then he had Mr. A.M. call "Tee" so that "Tee" could also agree with

20

and offer to back the plan. After the phone call, defendant again asked but sweetened the request with a promise of $20,000 and stated he and "Tee" would "make sure you straight."

## B. Discrepancy between the Parties and Probation

According to the Rule 11, with the enhancements included in the plea agreement, the parties anticipated an offense level of 23 after acceptance of responsibility. An offense level of 23 and a criminal history category of III yields an advisory guideline range of 57-71 months of imprisonment. Probation anticipates an offense level of 25 after acceptance of responsibility. An offense level of 25 and a criminal history category of III yields an advisory guideline range of 70-87 months. There is a two-point difference between the parties' final offense level and Probation's. If the court honors the parties' intentions in the Rule 11, then per the terms of the Rule 11, the Government seeks a sentence of 57 months, the bottom of the guideline range. If the court honors the Probation Department's calculation, then per the terms of the Rule 11, the Governments seeks a sentence of 70 months, the bottom of the guidelines.

## C. Section 3553(a) Factors

In fashioning a just sentence, this Court must consider the Section 3553(a) factors. The government discusses those factors below.

21

i.      Nature and circumstances of the offense

Wallace committed this offense within two months of being placed on parole. Wallace was paroled on October 27, 2020. However, prior to that, on September 21, 2020, he signed MDOC form CSJ-290 acknowledging that he is prohibited from possessing a firearm. **(Government's Exhibit 3 incorporated by reference)**. Unlike most parolees, who struggle to find any means of employment, much less financially exorbitant employment, Wallace obtained a lucrative occupation as a Rap artist shortly after release from prison. He was paid $300,000 cash. By all accounts, he was on a new career path. By committing this offense shortly after parole release, and despite his recent Rap success, Wallace showed he is not ready to cease from his recidivist ways. A sentence at the bottom of the determined guidelines range serves to send a message to Wallace that his continuation of his annual crime spree must stop.

ii.      History and Characteristics of the defendant

In continuing to break the law and possess firearms so soon after parole and in contravention of the MDOC form CSJ-290 he executed; Wallace has demonstrated that he prefers to remain on the annual crime spree he has been on since he was fourteen years old. A crime spree that was only interrupted when he was imprisoned in the MDOC. Wallace has demonstrated that even success in the Rap field is not enough to deter him from his criminal ways. Wallace has

demonstrated that he still does not care and is not ready to become a productive and law-abiding citizen. Even financial success is not a deterrent to his recidivism. Rather, it is merely a tool with which to attempt to buy his way out of his wrongdoing. Wallace's prior incarceration and recent parole release did little to deter him from continuing to engage in criminal activity.

Because of his unappreciativeness and continued criminal activity, a sentence at the bottom of the determined guidelines serves to send a message to Wallace that his continuation of his annual crime spree must stop.

<div style="margin-left: 2em;">

iii. <u>Seriousness of the offense, promotion of respect for the law, and just punishment for the offense</u>

</div>

Wallace's offense is a serious one. He was riding around drinking alcohol and likely using or about to use the marijuana found near his seat. The only reason for possessing those loaded firearms is to potentially use them. Inebriation combined with loaded firearms is a dangerous mix. Given his recent release and execution of the MDOC form CSJ-290, Wallace showed no respect for the law when he committed this offense. Wallace demonstrated even more contempt for the law when he tried to buy his way out of the consequences of his actions. Given Wallace's contempt for the law, and his acting above the law by thinking he can buy his way out of the situation, this Court should mitigate the continued criminal risk posed by felons like him by imposing a significant sentence. Promotion of respect for the law and just punishment requires a custodial sentence at the bottom

23

of the determined guidelines range.

    iv. <u>Adequate deterrence and protection of the public</u>

  Deterrence of Wallace, and protection of the public, requires a custodial sentence at the bottom of the determined guidelines range.  This Court's sentence must send a message to the public that status as Rap star does not place a person above the law. Wallace has demonstrated that he is not ready to stop his annual crime spree and that he refuses to change his criminal ways. Wallace needs a sentence that will remove him from the community for a lengthy time and deter him from further criminal conduct.

  A bottom of the guidelines sentence will prevent Wallace from committing additional criminal activity and send a message to him and the surrounding community that offenses perpetrated by felons in possession of firearms or ammunition will be met with the commensurate punishment it deserves.  If he receives a sufficient bottom of the guideline custodial sentence now, when he leaves federal prison, Wallace will have the sobering realization that his recidivist behavior must finally cease. Also, felons like defendant, and the community at large, will be on notice that regardless of Rap star status, they will be fully punished for such criminality.

## Conclusion

The government recommends a sentence of imprisonment at the bottom of the determined guidelines range.

Respectfully submitted,

DAWN N. ISON
United States Attorney

s/ Terrence R. Haugabook
Terrence R. Haugabook
Assistant United States Attorney
211 W. Fort Street, Suite 2001
Detroit, MI  48226
(313) 226-9157
Terrence.Haugabook@usdoj.gov

Dated: March 23, 2023

## CERTIFICATE OF SERVICE

I hereby certify that on March 23, 2023, I caused the foregoing document to be electronically filed with the Clerk of the Court using the ECF system, which will send notification of such filing to all ECF participants of record.

s/ Terrence R. Haugabook
Terrence R. Haugabook
Assistant United States Attorney
211 W. Fort Street, Suite 2001
Detroit, MI  48226
(313) 226-9157
Terrence.haugabook@usdoj.gov